# LEASE

THIS LEASE, made as of the _22ⁿᵈ_ day of _July_ , 2005 by and between **John W. Goff**, an individual, hereinafter called the "Landlord", and **Regions Bank**, an Alabama state banking corporation, hereinafter called "Tenant".

## WITNESSETH

1. **LEASED PREMISES**. In consideration of the rents hereinafter reserved and all of the terms, conditions, covenants and agreements hereinafter contained, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord a portion of the ground floor of the Goff Group Building, (hereinafter referred to as the "Building") situated at 80 TechnaCenter Drive, in the City of Montgomery, State of Alabama (hereinafter sometimes referred to the "Leased Premises"). The Leased Premises are hereby specified to contain approximately ten thousand, seven hundred thirty-two (10,732) square feet of Rentable Area (as hereinafter defined) on the ground floor of the Building and as depicted on the floor plan attached hereto as Exhibit "A".

The term "Rentable Area" as used in this Lease shall mean: (a) as to each floor of the Building on which the entire space rentable to tenants is or will be leased to one tenant (hereinafter referred to as "Single Tenant Floor"), the entire floor area computed by measuring to the inside finished surface of the Dominant Portion (as hereinafter defined) of the permanent outer building walls on such floor, including all areas, hereinafter referred to as "Common Areas", used for elevator lobbies, corridors, restrooms, mechanical rooms, electrical rooms, and telephone closets without deductions for columns or other structural portions of the Building or vertical penetrations that are included for the special use of Tenant but excluding the area contained within the exterior walls of the Building such as stairways, fire stair towers, vertical ducts, elevator shafts, flues, vents, stacks, and pipe shafts; and (b) as to each floor of the Building which space is or will be leased to more than one tenant (hereinafter referred to as "Multi-Tenant Floor"), the Rentable Area shall be the total of (i) entire floor area included within the Leased Premises, being the floor area bounded by the inside surface of the Dominant Portion (as hereinafter defined) of the permanent outer building walls or if the Leased Premises are not bounded on all sides by exterior walls, then such floor of the Building bounding such Leased Premises, as depicted on **Exhibit A**; the finished surface of the exterior of all interior walls separating such Leased Premises from any public corridors, other public or common areas, or building core on such floor; and the center-line of all walls separating such Leased Premises from other area leased, or to be leased, to other tenants on such floor; and (ii) a pro rata portion of the Common Area of such MultiTenant floor. (For purposes of this Lease, the "Dominant Portion" shall mean that portion of the inside finished surface of the permanent out wall of the Building which is fifty percent (50%) or more of the vertical floor to ceiling dimension.) The floor area computation described herein complies with A.N.S.I.Z65.1 1980 (revision of A.N.S.I.Z65.1 1972) approved July 3, 1980 by the American National Standards Institute, Inc.

1/1353244.3

1

**2. TERM**. The initial term of this Lease shall be three (3) years and four (4) months, to wit: From the 1st day of September 2005 (the "Commencement Date"), to the 31st day of December, 2008. Provided Tenant is not in default of its obligations under the Lease, Tenant shall have the right to renew the Lease for one additional two (2) year term by providing Landlord with written notice no later than June 30, 2007. Rent for the renewal term shall be as set forth in Section 5 below.

Provided Tenant is not in default of its obligations under the Lease, Tenant shall have the one-time right to cancel this Lease as of midnight on April 30, 2006 ("Early Termination Date"), if, but only if, Tenant gives written notice to Landlord on or before February 1, 2006, time being of the essence, of its election to terminate the Lease effective the Early Termination Date. If the foregoing conditions are satisfied, the term of the Lease shall end on the Early Termination Date, as if such date was originally the date set forth herein for the term of this Lease to expire. In the event the foregoing conditions are not satisfied, Tenant's right to terminate shall become null and void and of no force and effect.

**3. USE AND RESTRICTIONS**.

(a) Tenant hereby agrees that it will use the Leased Premises for an office and for no other use, and that its successors and assigns, or anyone holding by, through or under them, shall not use nor permit the use of the Leased Premises for any other purpose.

(b) As long as Tenant occupies the Leased Premises, Tenant, together with its customers, invitees and business guests, shall have the right to use, free of charge, but in common with Landlord, its successors, assigns, tenants, subtenants, concessionaires, licensees and any of their customers, invitees and business guests, all of the access roads, service driveways, footways, sidewalks, exits, entrances, hallways, reception areas, lobbies, elevators and stairways, and areas and facilities for the parking of automobiles at any time and from time to time existing in and around the Building, except for 3 parking spaces reserved or to be reserved as designated on Exhibit B attached hereto for the exclusive use of Tenant, and except for other areas currently reserved for the exclusive use of Landlord or other tenants or occupants of the Building, and except for periods of time during which said areas are being repaired, altered or reconstructed, provided Landlord shall make available an alternate means of access.

Neither Landlord nor Tenant nor anyone holding under or through either of them shall make any charge for the use of the parking facilities to the other or to the customers, invitees or business guests of Landlord or Tenant or anyone else hereinbefore granted the right to use said facilities, nor will either Landlord or Tenant permit anyone else to make any such charge for such use.

**4. BASE RENTAL**. Tenant hereby agrees to pay a base annual rental (herein called the "Base Rental") at the rate of $14.00 per square foot of Rentable Area of the Leased Premises. Tenant's Base Rental is comprised of (i) and initial "Net Rental Rate" of $9.50 per square foot, and

2

(ii) an estimate that the annual Basic Operating Cost (hereinafter defined) will be equal to $4.50 per square foot of Rentable Area (which amount multiplied by the Rentable Area of the Leased Premises is herein referred to as the "Basic Operating Cost Portion of the Base Rental"). The Tenant shall also pay as additional rent, all such other sums of money as shall become due and payable by Tenant to Landlord under this Lease. The Base Rental and the Basic Operating Cost Adjustment (hereinafter defined) and, except as otherwise hereinafter provided any other additional rent provided for herein and then in effect, shall be due and payable in twelve (12) equal monthly installments on the first business day of each calendar month during the initial term and any extensions or renewals thereof, and Tenant hereby agrees to pay such rent to Landlord monthly in advance without demand and without any reduction, abatement, counterclaim or setoff, at such address as may be designated by Landlord. The "Base Rental", the "Basic Operating Cost Adjustment" and any other additional rental shall be collectively referred to as "Rent" or "rent".

If the term of this Lease Agreement as heretofore established commences on other than the first day of a month or terminates on other than the last day of a month, then the Rent provided for herein for such month or months shall be prorated and the installment or installments so prorated shall be paid in advance. All past due installments of rent shall bear interest at the lesser of (i) the maximum rate permitted by applicable law, or (ii) three (3) percentage points above the Prime Rate (hereinafter defined), from the date due until paid. The term "Prime Rate" for purposes of this Lease Agreement, shall mean the rate announced as such by Chase Manhattan Bank or its successors at its principal office, on the date or dates on which reference to the Prime Rate is being made, and shall not be subject to adjustment, but shall in no event exceed the maximum rate provided by applicable law. In the event the "Prime Rate" index for interest rate determination becomes unavailable at any time, then the interest rate index then being used by Chase Manhattan Bank shall be applicable hereunder in lieu of the "Prime Rate".

     5.  **BASE RENTAL ADJUSTMENT.** The annual Base Rental shall be increased by three percent (3%) of the Net Rentable Rate, each Rental Year effective on the anniversary date of the Commencement Date for the initial term. If Tenant renews this Lease pursuant to Section 2, the Base Rental shall be increased by six percent (6%) of the Net Rentable Rate, effective on January 1, 2009 and January 1, 2010.

     6.  **BASIC OPERATING COST.** "Basic Operating Cost", as that term is used herein, shall consist of all operating expenses of the Building. Basic Operating Cost shall be computed on an accrual basis and shall be determined in accordance with generally accepted accounting principles, which shall be consistently applied. The term "operating expenses" as used herein shall mean all expenses and costs (but not specified costs that are separately billed to and paid by specific tenants) of every kind and nature that Landlord shall pay or become obligated to pay because of or in connection with the ownership and operation of the Building and all facilities used in the operation of the Building and such additional facilities now and in the future as may be determined by Landlord to be necessary to the Building, including, but not limited to, the following:

        (a)  Wages and salaries of all employees engaged in the daily operation and

1/1353244.3

maintenance of the Building, employer's social security taxes, unemployment taxes or insurance, and any other taxes that may be levied on such wages and salaries, the cost of disability and hospitalization insurance, pension or retirement benefits, and any other fringe benefits for such employees;

(b)   All supplies and materials used in the operation and maintenance of the Building;

(c)   Cost of all utilities, including telephone, cable television, water, sewer, steam, electricity, gas and fuel oil used by the Building and not charged directly to another tenant, and other utilities that may be available from time to time;

(d)   Cost of customary Building management, janitorial services, clerical, accounting and legal services (other than services attributable solely to a particular tenant), trash and garbage removal, servicing and maintenance of all systems and equipment including, but not limited to, elevators, plumbing, heating, air conditioning, ventilating, lighting, electrical, security and fire alarms, fire pumps, fire extinguishers and hose cabinets, mail chutes, guard service, painting, window cleaning, landscaping and gardening;

(e)   Cost of all insurance, including but not limited to fire, casualty, liability and rental abatement insurance applicable to the Building and Landlord's personal property used in connection therewith;

(f)   Cost of repairs, replacements and general maintenance (excluding repairs and general maintenance paid by proceeds of insurance or by Tenant or other third parties and not reimbursed by Landlord, and alterations attributable solely to tenants of the Building other than Tenant).

(g)   Any and all maintenance costs related to Common Areas and public areas of the Building including sidewalks, skyways, landscaping and service areas.

(h)   All "Taxes", which shall mean all impositions, taxes, assessments (special or otherwise), water and sewer charges and rents, and other governmental liens or charges of any and every kind, nature and sort whatsoever (except only those taxes of the following categories: any inheritance, estate, succession, transfer or gift taxes imposed upon Landlord, or any income taxes specifically payable by Landlord or its joint venturers without regard to Landlord's income source as arising out of or from the Building and/or the land on which it is located) attributable in any manner to the Building, the land on which the Building is located, or the rents (however the term may be defined) receivable therefrom or any part thereof, or any facility located therein or thereon or used in conjunction therewith or any charge or other payment required to be paid to any governmental authority, whether or not any of the foregoing shall be designated "real estate tax", "rental tax", "excise tax", "business tax" or designated in any other manner.

4

Notwithstanding any other provision herein to the contrary, it is agreed that in the event the Building is not fully occupied during any partial year or any full calendar year, the Basic Operating Cost for such period shall be the amount reasonably estimated by Landlord that the Basic Operating Cost would have been had the Building been fully occupied.

7. **BASIC OPERATING COST ADJUSTMENT**. Commencing the 2007 calendar year, and continuing throughout the Term of this Lease and any renewals or extensions thereof, Tenant agrees to pay to Landlord, as an adjustment to Base Rental, Tenant's Proportionate Share (as hereinafter defined) of the actual Basic Operating Cost for such calendar year in excess of $4.50 per square foot of Rentable Area in the Building ("Basic Cost Excess"). During each calendar year of this Lease following the 2006 calendar year, and in addition to the Base Rental, Tenant shall make monthly payments equal to 1/12th of the Basic Cost Excess determined for the previous calendar year (the "Basic Operating Cost Adjustment"). At the end of each such calendar year, the total Basic Operating Cost Adjustment paid by Tenant during that calendar year shall be compared by Landlord to the Basic Cost Excess for such year. If the total Basic Operating Cost Adjustment paid by Tenant for such calendar year is less than the amount actually due, then Tenant shall pay the difference, as Rent, to Landlord within ten (10) days after receipt of notice of the amount due. If the total Basic Operating Cost Adjustment paid by Tenant for such calendar year is more than the amount actually due, the excess shall, at Landlord's option, be paid to Tenant, or be credited by Landlord against the next payment of Rent becoming due. The effect of this reconciliation payment is that Tenant will pay its Proportionate Share of the Basic Cost Excess and no more.

At the commencement of each calendar year, Tenant shall continue to pay the monthly Basic Operating Cost Adjustment based on the rate which was in effect during the previous calendar year until such time as written notice of the revised Base Operating Cost Adjustment and a statement of any additional rent due for the months already elapsed in the new calendar year are received from Landlord. Such notice and statement shall be provided by Landlord within in a reasonable period of time after the end of any calendar year for which a Basic Operating Cost Adjustment is applicable. Tenant shall commence making payment of any such revised Basic Operating Cost Adjustment on the next rent date following receipt of such notice, and thereafter shall make monthly rent payments based on the revised Basic Operating Cost Adjustment until notified by Landlord of a new revised rate as set forth above. Landlord's failure to so notify Tenant within a reasonable period of time after the closing of any calendar year for which additional rent is due under the provisions of this Section shall not release Tenant from paying nor diminish Tenant's obligation to pay such additional rent.

Tenant shall have the right to audit Landlord's books and records pertaining to Basic Operating Costs, and Landlord shall cooperate in good faith with Tenant in the conduct of such audit. If the audit reveals that the amount billed to Tenant is greater than five percent (5%) in excess of Tenant's actual Basic Operating Cost, Landlord shall pay Tenant's expense of said audit, and Tenant shall be entitled to a refund, or, at Tenant's option, a credit against the next installment(s) of Rent.

5

Tenant's "Proportionate Share", as used herein, shall be the percentage derived by dividing the Rentable Area of the Leased Premises by the total Rentable Area contained in the Building. Should this Lease Agreement commence or terminate at any time other than the first day of a calendar year, the computations set forth in this Section shall be prorated for the partial year.

8.  **ASSIGNMENT AND SUBLETTING**.  Tenant expressly covenants that it shall not assign, mortgage or encumber this agreement, nor sublet nor permit the Leased Premises, nor any part thereof, to be used by others without the prior written consent of Landlord in each instance, which consent may among other things be based upon Landlord's determination that the proposed assignee or sublessee is compatible with the tenant mix at the Building and has a reputation and financial strength acceptable to Landlord.  If, with consent of Landlord, this Lease be assigned, or the Leased Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant, undertenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed to relieve Tenant of any of its obligations hereunder nor be deemed a waiver of this covenant, or the acceptance of the assignee, sub-tenant or occupancy as tenant, or a release of Tenant named herein from the further performance by such Tenant of the covenants on the part of Tenant herein occupied, it being understood and agreed that Tenant named herein shall at all times remain the primary obligor under the Lease. The consent by Landlord to an assignment or subletting shall not in any way be construed to relieve Tenant from any obligations under this Lease or act as a waiver by Landlord of the requirements for the express consent, in writing, of Landlord to any further assignment or subletting.  Notwithstanding anything to the contrary contained herein, assignments by operation of law, such as a merger or corporate restructure, shall not require Landlord's consent.

9.  **STATUS**.  Tenant agrees at any time and from time to time, upon not less than thirty (30) days' prior notice by Landlord, to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent and other charges have been paid in advance, if any, and stating whether or not Landlord is in default in performance of any covenant, agreement or condition contained in this Lease, and if so, specifying each such default, it being intended that any such statement delivered pursuant to this Paragraph may be relied upon by any party to whom such certificate may be delivered by Landlord.

10.  **WORK TO PREMISES**.  Except for the work, if any, to be performed by Landlord as set forth under Landlord's Work on **Exhibit C** ("**Landlord's Work**"), Landlord shall not be obligated to perform any work to the Premises prior to the Commencement Date and Tenant accepts the Premises in its "**AS IS**" condition.  With respect to Landlord's Work, if applicable, Landlord shall cause the same to be performed in all material respects in accordance with **Exhibit C**.

For the purpose of performing its obligations hereunder and for the purpose of installing its

6

fixtures and other equipment, upon notice from Landlord Tenant will be permitted to enter the Premises prior to the commencement of the Term, on condition that (i) Tenant's activities are conducted in such a manner so as not to interfere with Landlord, Landlord's contractor and workmen, or any other tenants, occupants, customers or invitees of the Building, or any of their respective contractors, and (ii) Tenant shall, at its own expense, remove from the Leased Premises and from the Land in its entirety, all trash which may accumulate in connection with Tenant's activities. It is understood and agreed that during said period, prior to the Commencement Date, Tenant shall perform all duties and obligations imposed by this Lease, saving and excepting only the obligation to pay Base Rental, and Additional Rental.

     **11. CONDITIONS OF PREMISES**. Tenant hereby acknowledges that it shall maintain the Leased Premises in good condition throughout the term of this Lease as the same are at the commencement of said Term or may be put in during said Term, reasonable wear and tear excepted.

     **12. ALTERATIONS, REPAIRS AND MAINTENANCE.**

     (a) No improvements, additions, or other alterations, including, but not limited to the removal of partition walls or additions, shall at any time be made by Tenant without Landlord's prior written consent. Tenant shall (except for repairs to be performed by Landlord as provided in Paragraph (b) below), at its sole cost and expense, keep and maintain in good order, condition and repair (which repair shall mean replace if necessary) the Leased Premises and every part thereof. If Tenant refuses or neglects to commence or complete any of the obligations above set forth promptly and adequately, Landlord may, but shall not be required to do so, make or complete said maintenance or repairs and Tenant shall pay the cost thereof to Landlord upon demand. All work, repairs and alterations made by Tenant shall be done in a good and workmanlike manner and in compliance with any applicable governmental rules and regulations and the cost thereof shall be paid by Tenant in cash or in equivalent, so that the Leased Premises shall, at all times, be free of liens for labor and materials supplied or claimed to have been supplied to the Leased Premises. Any alterations shall immediately become the property of Landlord, subject only to the use of same by Tenant during the term of this Lease. The term "alterations" is defined to include only those items permanently affixed to the Building.

     (b) Landlord agrees to perform all necessary repairs and maintenance which shall be considered as Operating Expense pursuant to Paragraph 6, except such repairs as are designated on Exhibit C, which shall be at Landlord's sole cost, without pass-through.

     (c) Tenant shall indemnify and save Landlord harmless from and against any and all costs, expenses, claims, losses, damages, fines or penalties, including reasonable attorney's fees, because of or due to Tenant's failure to comply with the provisions of Subparagraph (a) of this Paragraph 12, and Tenant shall not call upon Landlord for any disbursement or outlay of money whatsoever in connection with such work, and hereby expressly releases and discharges Landlord of and from any liability or responsibility whatsoever in connection therewith.

7

1/1353244.3

(d) Nothing contained in this Lease shall authorize Tenant to do any act which may create or be the foundation for any lien, mortgage or other encumbrance upon the revision or other estate of Landlord, or of any interest of Landlord in the Leased Premises, or upon or in the building or improvements thereof; it being agreed that should Tenant cause the alterations, changes, additions, improvements or repairs to be made to the Leased Premises, or cause materials to be furnished or labor to be performed therein or thereon, neither Landlord nor the Leased Premises shall, under any circumstances, be liable for the payment of any expense incurred or for the value of any work done or material furnished to the Leased Premises, or any part thereof; Tenant shall upon request of Landlord deliver such documents as may be required by Tenant in order to effectuate the lien protection required by this paragraph; all such alterations, changes, additions, improvements and repairs and materials and labor shall be at Tenant's expense and Tenant shall be solely and wholly responsible to contractors, laborers and materialmen furnishing labor and material to the Leased Premises and Building or any part thereof. If, because of any act or omission of Tenant, any mechanic's or other lien or order for the payment of money shall be filed against the Leased Premises or any building or improvements thereon, or against Landlord (whether or not such lien or order is valid or enforceable as such), Tenant shall, at Tenant's own cost and expense within thirty (30) days after the date of filing thereof, cause the same to be cancelled and discharged of record, or furnish Landlord with a surety bond issued by a surety company reasonable satisfactory to Landlord, protecting Landlord from any loss because of such lien claim and further shall indemnify and save harmless Landlord from and against any and all costs, expenses, claims, losses or damages, including reasonable attorney's fees, resulting thereupon or by claims, losses or damages, including reasonable attorney's fees, resulting thereupon or by reason thereof.

13. <u>**INDEMNITY AND LIABILITY INSURANCE**</u>. Tenant agrees to indemnify and save Landlord harmless against any and all claims, demands, damages, costs and expenses, including reasonable attorney's fees for the defense thereof, arising from the conduct or management of business conducted by Tenant in the Leased Premises, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed, pursuant to the terms of this Lease, or from any negligence of Tenant, its agents, contractors, servants and employees, in or about the Leased Premises and the Building.

Tenant will, during the term of this Lease, at its own cost and expense, maintain and provide general liability insurance from a reputable insurance company licensed to do business in Alabama for the benefit and protection of Landlord and Tenant (said policy to name Landlord and any manager of the Building as co-insureds) in an amount not less than $1,000,000.00 for combined single limit coverage for liability and property damage. Said policy shall cover the Leased Premises. The general liability policy or a certificate thereof, together with proof of payment of premium, shall be delivered to Landlord on or before the Commencement Date and, with respect to renewals thereof, not less than twenty (20) days before its expiration date. Said policy and/or certificate shall contain an obligation by the insurer to give Landlord no less than ten (10) days' written notice of any cancellation or change in scope or amount of coverage of such policy. If tenant fails to comply with this requirement, Landlord may obtain such insurance and keep the

1/1353244.3

same in effect and Tenant shall pay Landlord the cost thereof upon demand as additional rent.

    **14.**   <u>**HEATING AND COOLING.**</u>  The Landlord will exercise reasonable diligence to keep the Leased Premises heated and cooled by central heating and cooling equipment from 6:30 a.m. to 7:00 p.m., Monday through Friday and on Saturday from 8:00 a.m. to 3:00 p.m. Landlord will furnish a reasonable amount of electric light as the Landlord may determine for lighting the Leased Premises, but the Landlord shall, in no event, be liable for damages for stoppage of heat, cooling, or light, or for the machinery or appliances breaking or getting out of order, or being out of repair, or for any damages arising out of any failure to furnish such heating, cooling or light, or for any damage or injury to any person or property caused by any defects in the equipment furnishing Tenant with the steam, gas, electricity or water. Nor shall the Landlord be liable for any damage which may occur on account of any defect of said Building or Leased Premises, or from rain, wind or other cause. Landlord will, however, make every reasonable effort to effect repairs to nonfunctional heating, cooling or lighting systems, or any part of the Leased Premises damaged by wind, rain or other cause.

    In the event Tenant requires access through systems controls to heating and cooling services or any other utilities herein, Landlord agrees that Tenant may have access to such heating and cooling services and utilities through systems controls; provided, however, Tenant shall reimburse Landlord its reasonable, actual and documented costs of providing such extra utilities and services ("Actual Costs") without a profit to or overhead charge by Landlord; it being estimated that the charge for such use after hours for heating and cooling is approximately Forty Dollars ($40.00) per hour per zone so used by Tenant.

    **15.**   <u>**FIRE DAMAGE.**</u>  Landlord agrees to maintain fire and casualty insurance on the building during the Term of this Lease. If the Leased Premises shall be partially damaged by fire, the damages shall be repaired by and at the expense of Landlord and, if such fire was not due to the neglect of Tenant or its invitees, licensees or agents, the Rent until such repairs shall be made shall be apportioned according to the part of the Leased Premises which is usable by Tenant. Tenant reserves the option to terminate this Lease in the event that repairs required as a result of partial damage by fire cannot be completed within 60 days from date of damage and such fire was not due to the neglect of Tenant or its invitees, licensees, or agents. No penalty shall accrue for reasonable delay which may arise by reason of adjustment of insurance on the part of Landlord and for reasonable delay on account of "labor troubles", or any other cause beyond Landlord's reasonable control. If Landlord shall decide not to restore or not to rebuild the Leased Premises, or if the Leased Premises are totally damaged or are rendered wholly untenantable by fire or other cause, or if the Building shall be so damaged that Landlord shall decide to demolish it or not to rebuild it, then or in any of such events, Landlord may, within thirty (30) days after such fire or other cause, give Tenant notice in writing of such decision and thereupon the term of this Lease shall expire by lapse of time upon the third day after such notice is given, and Tenant shall vacate the Leased Premises and surrender same to Landlord. Tenant shall carry adequate hazard insurance on the contents of the Leased Premises.

9

16.  **WAIVER OF SUBROGATION**.  Landlord and Tenant release and waive any claim or right of recovery against the other, its agents, subsidiaries and affiliated corporations for any loss resulting from causes covered by insurance and shall procure a waiver of subrogation on the part of the insurer, if Tenant's insurer will agree or consent to said waiver of subrogation, against the other by an endorsement to all fire and casualty insurance policies whereby the insurer recognizes that the insured has waived any right of recovery from the other party, its agents, subsidiaries and affiliated corporations.  A copy of such endorsement shall be deposited with the other party.  Neither Landlord nor Tenant shall be liable for any damage to or destruction of the other party's goods, merchandise, fixtures or property caused by fire or any other cause whatsoever to the extent covered by insurance.

17.  **CONDEMNATION**.  The parties hereto agree that should the Leased Premises, or such portion thereof as will make the Leased Premises unusable for the purposes herein leased, be taken or condemned by competent authority for public or quasi-pubic use, then this Lease shall terminate from the date of the taking.  If this Lease continues after partial taking, the Rent shall abate proportionately as to the part taken.  If such partial taking exceeds thirty percent (30%) of the Rentable Area of the Leased Premises, Tenant has the option to cancel this Lease.  All compensation awarded for such taking of the building, the fee and the leasehold, shall belong to and be the property of Landlord; provided, however, that Landlord shall not be entitled to any portion of the award made to Tenant for the value of Tenant's trade fixtures or unamortized portion of permanent improvements or additions made by Tenant.  Tenant shall not be entitled to any damages for the unexpired portion of the Term of this Lease; provided, however, Tenant may pursue a separate award from the condemning authority if the same does not or will not reduce or diminish Landlord's award in any way.

18.  **PERSONAL PROPERTY**.  Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in or about the Leased Premises, including, but not limited to shelves, counters, vaults, vault doors, wall safes, furniture, partitions, fixtures, refrigerators and heating, ventilation and air conditioning equipment.  If any such taxes are levied against Landlord or Landlord's property, and if Landlord pays same, or if the assessed value of Landlord's premises is increased by the inclusion therein of a value placed on such property, and if Landlord pays the taxes based on such increased assessment, Tenant, upon demand, shall repay to Landlord the taxes so paid by Landlord or the proportion of such taxes resulting from such increase in assessment.

19.  **REMEDIES OF LANDLORD**.

(a)  (i)  If Tenant shall default in the payment of the Rent reserved herein, or in the payment of any item of Additional Rent or other monies due hereunder, or any part of same, or if Tenant shall default in the observance of any of the other terms, covenants and conditions of this Lease and such default is not cured within ten (10) days for a monetary default and thirty (30) days for a non-monetary default, after written notice thereof by Landlord, or such additional time as may be reasonably necessary to complete the cure, excluding additional time for payment of Rent; or

(ii)  If Tenant shall sublet the Leased Premises or assign this Lease except as provided herein; or

(iii)  If Tenant shall make an assignment for the benefit of creditors, or file a voluntary petition in bankruptcy, or be adjudicated a bankrupt by any court, or if Tenant takes the benefit of any insolvency act, or if Tenant be dissolved voluntarily or involuntarily or have a receiver of Tenant's property appointed in any proceedings; then, upon the happening of any one or more of the defaults or events specified above, the Tenant's right of possession shall [to the extent permitted by law with respect to the matters in (ii)] at the option of Landlord, cease (without terminating the Lease term), and thereupon or at any time thereafter, Landlord may re-enter said premises, either by force or otherwise, without terminating this Lease, and have possession of the same and/or may recover possession thereof by summary proceedings or otherwise (but Tenant shall remain liable to Landlord as hereinafter provided).

(b)  In the event of any one or more of the defaults as set out in Paragraph 19 (a) (i)-(iii) above, Landlord may repair or alter the Leased Premises in such manner as to Landlord may seem necessary or advisable, and/or let or re-let the Leased Premises and any and all parts thereof for the whole or any part of the remainder of the original term hereof or for a longer period, in Landlord's name, or as the agent of Tenant, and, out of any rent so collected or received, Landlord shall (first) pay to itself the expense and cost or retaking, repossessing, repairing and/or altering the Leased Premises, and the expense of removing all persons and property therefrom; and (second) pay to itself any cost or expense sustained in securing any new tenant or tenants.  It is the intent being that Tenant shall remain fully liable for all rents and any costs or expenses incurred by Landlord as hereinafter provided less any rental income derived from the reletting.   Any entry or reentry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from Liability hereunder.

(c)  Tenant and Landlord hereby expressly agree to reimburse the prevailing party for any reasonable attorney's fees and any and all costs and expenses incurred by the prevailing party in enforcing or defending the prevailing party's rights and remedies under this Lease.

(d)  The remedies provided to Landlord under this Paragraph 19 are not exclusive and Landlord may pursue any and all remedies otherwise provided by law, including, but not limited to, suing for rent as it comes due or terminating the Lease.

20.  **ACCESS TO PREMISES**.  Landlord and Landlord's representatives shall have the right to enter upon the Leased Premises at all reasonable times upon no less than twenty-four (24) hours prior written notice for the purpose of inspecting same or for making repairs, additions or alterations, or for the purpose of exhibiting same to prospective tenants, purchasers, or others, and during the last Six ( 6) months of the term of this Lease, Landlord may maintain "To Let" or similar signs near or upon the Leased Premises.  Landlord shall at all times have the right to place "For Lease or For Sale" signs in appropriate places near or upon the Leased Premises.

1/1353244.3

21. **REQUIREMENTS OF LAW**. Landlord and Tenant shall comply and cause their employees and other persons using the Building to comply with all certificates of occupancy laws, orders and regulations of federal, state, city, county and municipal authorities and fire insurance rating organizations which shall impose any duty upon the owner or occupant of the Leased Premises. Any failure to do so or other event caused by Tenant or its employees which increases the insurance risk or premium for the Building will allow Landlord to collect the costs associated with said increase from Tenant upon demand. Tenant shall not suffer or cause any waste or nuisance.

22. **NOTICES**. All notices to be given pursuant to this Lease shall be in writing and shall either be served personally or sent by prepaid certified or registered mail to the address of the parties below specified, or at such other address as may be given by written notice in the manner prescribed in this Paragraph. Any notices to Landlord shall be sent to Landlord at 3500 Eastern Boulevard, P. O. Box 235000, Montgomery, Alabama 36123 or such other place as Landlord shall designate in writing. Tenant's address for notices shall be sent to Tenant at Portfolio Administration, 7130 Goodlett Farms Parkway, ALE, Cordova, TN 38016.

23. **BROKERAGE**. The parties agree that this Lease was brought about through the services of Aronov Realty Management, Inc. ("Broker") and that Landlord shall be responsible for paying to Broker its commission. Tenant has not used the services of any other agent or broker and shall indemnify and hold harmless landlord from and against any claim by any such agent or broker for any fee or commission based on said agent or broker's dealings with tenant.

24. **WAIVER**. No delay or omission of the exercise of any right by Landlord hereto shall impair any such right or shall be construed as a waiver of any default or as acquiescence therein. One or more waivers of any covenant, term or condition of this Lease by Landlord shall not be construed by tenant as a waiver of a subsequent breach of the same covenant, term or condition. No requirements whatsoever of this Lease shall be deemed or varied because of Landlord's failure or delay in taking advantage of any default, and Landlord's acceptance of any payment from Tenant with knowledge of any default shall not constitute a waiver of Landlord's rights in respect to such default, nor any subsequent or continued breach of any other requirements of this Lease. All remedies provided Landlord herein shall be construed as cumulative and shall be in addition to every other remedy otherwise available to Landlord.

25. **END OF TERM**. Upon the expiration or other termination of the term of this Lease, Tenant shall quit and surrender to Landlord the Leased Premises "broom-clean" and in good order and condition ordinary wear excepted. If the last day of the term of this Lease or any renewal thereof falls on a Sunday, this Lease shall expire on the business day immediately following. Tenant shall remove all property of Tenant in a reasonable time and manner, but not after expiration or termination of the term of this Lease, and failing to do so, any such property shall be deemed abandoned by Tenant and Landlord may, in its discretion, cause all or any part of the said property to be removed, stored, discarded or otherwise disposed of at the expense of Tenant, and Tenant

12

hereby agrees to pay all costs and expenses thereby incurred. Tenant's obligations to observe or perform this covenant shall survive the expiration or other termination of the terms of this Lease.

26. **TENANT'S SIGNS**. Tenant shall be provided with the Building Standard signage on the Building entrance directory and at Tenant's entrance door and shall allow no other signs to be displayed in the Leased Premises.

27. **DEFINITIONS**. Words of any gender used in this Lease shall be held to include any other gender and words in the singular number shall be held to include the plural when the sense requires.

28. **SECURITY**. No security deposit is required.

29. **EXCULPATION**. Notwithstanding anything herein to the contrary, Tenant shall look solely to Landlord's interest in the Building for the satisfaction of any claim, judgement or decree requiring the payment of money by Landlord based upon any default hereunder, and no other property or assets of Landlord, its partners, affiliates, heirs, successors or assigns, shall be subject to levy, execution or other enforcement procedure for the satisfaction of any such claim, judgement, injunction or decree.

30. **AUTHORITY**. Landlord and Tenant do each hereby respectively represent to the other that it has the capacity and authority to enter into this agreement.

31. **ENTIRE AGREEMENT**. This instrument of Lease contains the entire and only agreement between the parties concerning the Leased Premises and no prior oral or written statements or representations, if any, of any party hereto or any representative of a party hereto, not contained in this instrument, shall have any force or effect. This Lease shall not be modified in any way except by a writing executed by Landlord and Tenant, and no oral agreement or representations for rental shall be deemed to constitute a lease other than this agreement. This agreement shall not be binding until it shall have been executed by Tenant and Landlord.

32. **RULES OF BUILDING**. Tenant and Tenant's agents, employees, invitees and licensees shall comply fully with all requirements of the rules of the Building which may be made by Landlord from time to time. A copy of the current Rules is marked **Exhibit B** attached hereto and made a part hereof.

Tenant shall be provided with a copy of any changes to the rules contained in **Exhibit B** within thirty (30) days after the date of any such change. These rules may cover the use of all common area, including parking areas, entrance ways, reception areas and any other areas that may be for the common use of Landlord and other tenants, as well as the use of the Leased Premises.

13

1/1353244.3

33. **SUCCESSORS IN INTEREST**.  All provisions herein contained shall bind and inure to the benefit of the respective parties hereto, their heirs, personal representatives, successors and assigns.  In the event Landlord or any successor-owner of the Leased Premises shall convey or otherwise dispose of the Leased Premises and/or the property of which the Leased Premises form a part, all liabilities and obligations of Landlord as lessor under this Lease shall be assumed by such successor-owner upon such conveyance or disposal and written notice thereof to Tenant, Landlord shall have the right to assign this Lease without the consent of Tenant and thereafter, Landlord shall have no liability hereunder except for such acts of the Landlord occurring prior to the transfer or assignment.

34. **SUBORDINATION**.  So long as Tenant is provided with a satisfactory non-disturbance agreement, Tenant agrees that this Lease shall, at Landlord's option, at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the Leased Premises by Landlord, and Tenant agrees, upon demand and without cost, to execute such additional instruments as may be requested by Landlord to further evidence such subordination.

Landlord agrees that so long as Tenant complies with and performs its obligations under the Lease without default, the Landlord will take no action which will interfere with or disturb Tenant's possession or use of the Leased Premises or other rights under the Lease, and in the event a third party becomes owner of the Leased Premises by foreclosure, conveyance in lieu of foreclosure or otherwise, the Leased Premises shall be subject to the Lease and the third party shall recognize Tenant as the tenant of the Leased Premises for the remainder of the term of the Lease and in accordance with the provisions thereof.

35. **TRANSFER OF TENANTS**.  Intentionally Deleted.

36. **COMMISSION**.  Landlord shall pay Aronov Realty Brokerage, Inc., a commission in the amount of two percent (2%), and Colonial Properties Services Inc., a commission in the amount of four percent (4%), on the aggregate Rent for the term, payable in four (4) consecutive equal monthly installments commencing on the Commencement Date.

14

I/1353244.3

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals the day and year fist above written.

WITNESSES:

LANDLORD:

John W. Goff
an Individual

By: _____

TENANT:

Regions Bank
an Alabama Corporation

ATTEST:

By: _____

Its: _____

15

1/1353244.3

EXHIBIT A



16A

Premises, caused by moving in or out of the Leased Premises by the Tenant of furniture, boxes or bulky articles.

17.     The use of anything except electricity for lighting the Leased Premises is prohibited.

18.     No installation of electric apparatus, telephone or other apparatus will be permitted except by the written consent of the Landlord, and under the direction of the Landlord or its agents.

19.     Without the written consent of the Landlord, the Tenant shall not install or use in the Leased Premises electric light bulbs of greater lighting capacity than such as are specified by Landlord, and without written consent of the Landlord. The Tenant shall not connect any electric or other device operated by or consuming electricity to the wiring of said Building.

20.     The Landlord reserves the right to make and enforce such other reasonable rules and regulations as in its judgment may be deemed necessary or advisable from time to time to promote the safety, care and cleanliness of the Leased Premises and for the preservation of good order therein.

21.     The Landlord reserves the right to alter, amend or modify these rules and regulations and also to promulgate new and additional rules and regulations at any time and in such event altered, modified, amended or new rules and regulations shall become a part thereof and shall have the same force and effect and be binding upon the Tenant to the same extent as if incorporated herein at the time of execution of this Lease.

19

1/1353244.3

Landlord. All glass, locks and trimmings in or upon the doors and windows respectively belonging to the building shall be kept whole, and when any part thereof shall be broken, the same shall be immediately replaced and repaired and put in order under the direction and to the satisfaction of the Landlord or its agents, at the expense of the Tenant, and shall be left whole and in good repair together with the same number and kind of keys as may be received by such Tenant on entering into possession of any part of the building during tenancy.

11.     Tenant shall not permit the preparation of food for consumption in the Leased Premises by third parties, nor the facilities for the preparation of food without written consent of Landlord. Tenant shall not use the premises for housing, lodging, sleeping, nor any immoral or illegal purpose. Landlord consents to the preparation of food by Tenant's employees in the kitchen portion of the Building.

12.     Two (2) keys to the entrance door to the space occupied by Tenant shall be furnished by Landlord. At the termination of this Lease, Tenant shall return all keys.

13.     Night Watch. The Landlord, in its discretion may establish a night watch, and, if established, after 7:00 P.M. the Building is in charge of the night watchman, and every person entering or leaving the Building is subject to be questioned by him as to his business in the Building, if unknown to the watchman.

14.     Tenant shall not operate, or permit to be operated, any mechanical machinery, steam engine, boiler, or stove without Landlord's written consent; Tenant will not allow the use of oil, burning fluids, kerosene, gasoline or other fuels to be used on the Leased Premises.

15.     Tenants are not to injure, overload or deface the Building, nor the walls of their premises, not to carry on or upon the premises any noisome, noxious or otherwise offensive business. Tenant shall not place equipment in the Leased Premises which will use more electricity than reasonably contemplated by the parties. In the event Tenant desires to put additional electrical equipment in the Leased Premises, it must obtain Landlord's consent, in writing, which consent shall not be withheld so long as it does not either overload the electrical capacity of the Leased Premises or increase the electrical bill being paid by Landlord as part of operating expense. Tenant shall not place signs, advertisements or other displays in its windows.

16.     Safes, furniture, fixtures, and supplies shall be brought into the Building only at reasonable times and in such manner as the Landlord or its agents shall designate, and shall be removed from the Building only at reasonable times as the Landlord or its agents shall designate. The Landlord retains the right to prescribe the weight and positions of all safes, and prohibits safes of over a certain weight to be determined by Landlord or its agents to be placed in said Building. All safes in position shall stand upon planks or other material of such character and thickness as the Landlord may direct. Iron safes after delivery to entry of Building are to be handled only by the Landlord. The Tenant is to be responsible for all damage to the Leased

1/1353244.3

# EXHIBIT B

## RULES AND REGULATIONS

1.      The entries, passage halls, stairways, and elevators and escalators shall not be obstructed or used for any purpose other than those of ingress and egress.

2.      No openings, sashes, sash-doors, windows or glass that admit or reflect light into the halls or any part of the building shall be covered or obstructed.

3.      The water closets, wash basins, sinks, etc., and other apparatus, shall not be used for any other purpose than those for which they were constructed; and no sweepings, rubbish or other substances shall be thrown therein, nor shall anything be thrown by the Tenant, its agents, or employees, out of the windows, doors or other openings.

4.      No nails, screws or other things shall be driven, screwed or otherwise placed in the walls, or any part of the building, except for the installation of photographs and paintings, which shall be deemed to be lightweight display items. Nor shall any change, defacement or alteration of any kind be made in any part of the building by the Tenant, its agents or employees. No objection shall be taken to bulletin boards and lightweight display items.

5.      No signs, advertisements or notice of any kind shall be painted, inscribed, or affixed on any part of the outside or inside of said Building except by the Landlord and the same shall be in such place and of such color, style and size as is specified by Landlord.

6.      No Tenant shall do or permit anything to be done in said premises or bring or keep anything therein which will in any way increase the rate of fire insurance on said building or on property kept therein, or obstruct or interfere with the rights of other Tenants, or in any way injure or annoy them or conflict with the laws relating to fires or with any insurance policy upon said building or any part thereof.

7.      No Tenant shall employ any person or persons or permit any person or persons other than the janitor or janitors of the Tenant (who will be provided with pass keys into the office), to enter the Leased Premises for the purpose of cleaning or taking charge of the Leased Premises.

8.      Tenant, its clerks, or employees, shall act in appropriate order in the Building.

9.      No animals or birds, bicycle or other vehicle shall be allowed in the Building.

10.     No additional locks shall be affixed to any door except by written consent of Landlord and on termination of lease all keys for locks including extra locks shall be delivered to

1/1353244.3

# EXHIBIT C

## DESCRIPTION OF LANDLORD'S WORK

**Prior to the Commencement Date,**

1. Landlord to paint interior walls of rental space.
2. Landlord to recarpet demised space with commercial grade carpet.
3. Landlord to secure interior doors between the Leased Premises and the contiguous office space not leased by Tenant.
4. Landlord to construct two glass demising walls to secure space as per Exhibit "A."
5. Landlord to repair or replace the HVAC unit, it being understood that repair and/or replacement of that system will not be passed through to Tenant as Basic Operating Cost.
6. Landlord to replace all cracked windows.
7. Landlord to repair rotten wood of roof and take such other measures as may be needed to prevent roof leaks.

All of the Landlord's Work shall be completed in compliance with all building codes and regulations, including fire codes, and in sufficient form to receive a certificate of occupancy.

1/1353244.3

<u>**FIRST AMENDMENT TO LEASE**</u>

THIS FIRST AMENDMENT TO LEASE (the "First Amendment")is made as of the _22_ day of August, 2005, by and between **John W. Goff** (the "Landlord") and **Regions Bank** (the "Tenant").

**RECITALS**

A.    Landlord and Tenant entered that certain Lease Agreement dated July 22, 2005 (the "Lease").  Unless otherwise defined herein, capitalized terms shall have the meaning assigned to them in the Lease.

B.    Tenant has requested that Landlord consent to certain alterations and tenant improvements pursuant to plans delivered to Landlord.

C.    Landlord has agreed to consent to Tenant's plans upon certain conditions, one of which is the execution of this First Amendment.

**AGREEMENT**

NOW, THEREFORE, in consideration of the above Recitals, Landlord and Tenant hereby amend the Lease as follows:

1.    Pursuant to Section 12(a) of the Lease, Landlord hereby approves the tenant improvements proposed by Tenant, pursuant to plans delivered by Tenant to Landlord (the "Tenant's Plans").

2.    Section 12 of the Lease is hereby amended by adding the following paragraph:

At the end of the Term, Tenant shall deconstruct all construction by Tenant pursuant to the Tenant Plans and return the Leased Premises to its original condition as of the date of the Lease.  Such deconstruction work shall include, but not be limited to the following:  (i) in the portion of the Leased Premises known as the "telecom room", the plywood backer board and the telecom equipment will be removed, and the holes in the drywall filled; and (ii) in the space known as the "telecom closet", Tenant will deconstruct both the new wall and door.  Tenant will not be required to paint the telecom room upon termination of the Lease, because the parties acknowledge that as of the date of the Lease, the telecom room was unpainted.  Notwithstanding anything to the contrary contained in this paragraph, the millwork/storage unit that Tenant intends to construct in the copier space, and the telecom cabling, may, at Tenant's option, remain in the Premises upon termination of the Lease.

1/1365927.1                                        1

Except as expressly amended hereby, the Lease shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

**LANDLORD:**

_____

John W. Goff, an individual

**TENANT:**

**Regions Bank**

By: _____

Its: _____

1/1365927.1                                    2